IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.  10-cv-00735-RBJ-MEH

CHERISSE CROLL,

　　　Plaintiff,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Connecticut Foreign
Corporation, and LOCKHEED MARTIN GROUP UNIVERSAL LIFE PLAN, an ERISA
Welfare Benefit Plan,

　　　Defendants.

---

## ORDER

---

This comes before the Court on "Plaintiff's Combined Motion and Brief in Support for

Summary Judgment to Reverse Defendant's Decision to Terminate her Life Insurance

Coverage." The Court has reviewed the motion [docket #26], response [#32], reply [#37],

administrative record [hard copy], and the parties' respective filings regarding supplemental

authority [#45-47]. The motion was ripe upon the filing of plaintiff's reply brief on November 5,

2010. The Court apologizes to the parties for the delay in resolving the case.

**Facts**

Martin Marietta Employee Benefit Plans

Cherisse Croll was employed as a Lead System Engineer and Functional Cognizant

Engineer at Martin Marietta. R. 678. While so employed she participated in two employee

benefit plans as defined in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§1002(1).

1

First, she was insured under the Martin Marietta (now Lockheed Martin) Long Term Disability Plan ("LTD Plan"), insured and administered by the Connecticut General Life Insurance Company ("Connecticut General"). R. 884. Under the terms of the LTD Plan, an individual who becomes disabled due to sickness or accidental bodily injury is potentially eligible for LTD benefits in two stages. If she is "totally disabled from performing the duties of [her] occupation," she will receive monthly income according to a schedule of benefits for 24 months (following a benefit waiting period). Thereafter, she can continue to receive monthly income if her "disability completely prevents [her] from engaging in any occupation for which [she is] qualified by training, education, or experience." R. 887.

Second, she was insured under the Lockheed Martin Group Universal Life Plan ("Life Plan"), sponsored and administered by Connecticut General. R. 1-60. Among other things the Life Plan provides a waiver of an insured's life insurance premiums if a participant suffers from "total disability." Total disability for this purpose means that the individual has "become totally disabled by bodily injury or sickness which completely prevents [her] from engaging in any occupation or employment for wage or profit." R. 10. This benefit, sometimes referred to as the Life Waiver of Premium or "LWOP" benefit, continues until the individual's 65th birthday provided that the total disability continues. *Ibid.*

<u>Ms. Croll's Disability</u>

Ms. Croll was diagnosed with Addison's disease by an endocrinologist, Susan Sherman, M.D., on November 13, 1992. R. 957, 973. That disease and related conditions cause her to suffer from fatigue, neck and back pain, depression, nausea, vomiting, and muscle weakness. R. 0646, 0648, 687, 720, 970, 1147, 1170, 1668, 1796.

Based on her medical conditions, Ms. Croll filed a claim for LTD benefits with Connecticut General after discontinuing work on April 9, 1993.  R. 882.  She was awarded LTD benefits effective October 10, 1993.  R. 673.  Ms. Croll has received her LTD benefit continuously since that time.  Ms. Croll also claimed to be eligible to receive the LWOP benefit under the Life Plan.  By letter dated April 6, 1996, Connecticut General approved Ms. Croll's claim for waiver of her life insurance premium.  R. 582-0583.

In 1995 Ms. Cross was also awarded disability benefits by the Social Security Administration.  R. 1563-67.  An Administrative Law Judge ("ALJ") determined that she had been disabled as defined by the Social Security Act since April 20, 1993.  The ALJ noted that Ms. Croll had attempted to work after the onset of her disability by (1) starting a home multi-media computer business in June 1993, which she discontinued in July 1994 due to stress and lack of earning; (2) working as a receptionist for a dentist, which she quit after one week due to her medical condition; and (3) selling housewares from her home in September 1994, which generated minimal income despite substantial help from her husband and children.  R. 1563-64.

The ALJ cited the opinions of Dr. Sherman and of Kevin J. Boyle, M.D., her treating physicians at that time, that she was totally disabled from any type of employment due to Addison's disease.  R. 1564.  He found that "[h]er impairment and the side effects from her medication to treat the impairment prevent the claimant from performing any work requiring more than minimal exertion, concentrating on job tasks, and maintaining attendance at any job without an unreasonable number of and length of rest periods."  R. 1564.  The ALJ concluded that, although Ms. Croll was 35 years old when her disability began and has a college degree, she was "unable to perform her past relevant work," that she "does not have transferable skills to

perform other work within her physical and mental residual functional capacity," and that "there are no jobs existing in significant numbers which she can perform." R.1565.

Over the years that followed Dr. Sherman consistently noted her position that Ms. Croll is incapable of performing any work. *See, e.g.*, R. 1333, 1350-1351, 1450. Dr. Sherman found Ms. Croll to be limited by fatigue and by potential exacerbation of her Addison's disease, particularly due to stress. For the same reasons, Ms. Croll's primary physician, Dr. Boyle, has repeatedly opined that Ms. Croll has been incapable of work. R. 0820, 0926, 0927, 1347-1348, 1451).

At the request of Connecticut General Dr. Boyle completed an attending physician's statement on November 15, 2007. He indicated that Ms. Croll has "class 5 limitations," remarking that she was "unable to work in any predictable fashion," and "no return to work [is] anticipated". R. 635. In a July 30, 2008 Physical Ability Assessment Form, Dr. Boyle indicated that "due to Addison's disease, easy fatigue, etc., [she is] unable to work in any capacity." R. 1778-1779.

Denial of LWOP Benefits

In 2008 Connecticut General undertook an evaluation of Ms. Croll's continuing entitlement to the LWOP and LTD benefits. In November 2008, it engaged PhotoFax, Inc. to conduct surveillance of Ms. Croll. The results, set forth in a Surveillance Report, R. 1753-62, were summarized by Micah Vandertulip, a "Fraud Specialist" for Connecticut General, in an internal memo dated December 3, 2008. R. 1750-51. Mr. Vandertulip states that Ms. Croll was "visibly inactive" during the first day of the surveillance period; that she was seen going to a library, a McDonald's and a grocery store on the second day; and that she was again "visibly inactive" on the third and fourth days. Ms. Cross was videotaped walking, entering her vehicle, driving, bending over, loading groceries into her vehicle (a 24-can case of Coca Cola and

multiple plastic bags, R. 1759), and conversing with an unidentified subject.  According to Mr.

Vandertulip, she performed these activities "in a fluid manner showing no visible signs of

restriction or discomfort."  *Ibid.*

On January 16, 2009, Dr. Boyle drafted a letter expressing his concerns regarding Ms.

Croll's undergoing a functional capacity evaluation, which Connecticut General had requested.

The letter stated in part:

> She was diagnosed with Addison's disease in approximately 1992.  She is on
> permanent disability because of this condition.  Her disability is related to
> exacerbations of easy fatigability and excessive fatigue related to the Addison's
> disease.  It is my understanding that she is scheduled for a functional capacity
> evaluation.  Functional capacity testing is contraindicated in this patient, because
> of the Addison's disease.  Such testing could precipitate a life threatening
> Addison's disease crisis.  It is also important to understand that this testing will
> likely be inaccurate for disabilities related to Addison's disease.  Her symptoms
> are intermittent and would not be accurately assessed with traditional functional
> capacity evaluation testing.

R. 1716.

Dr. Boyle was asked by Connecticut General to complete a Physical Ability Assessment

Form on January 23, 2009.  R. 1710-1711.  His January 26, 2009 report indicated that "[d]ue to

Addison's disease, easy fatigue, crisis, etc. [Ms. Croll] is unable to work in any capacity."  R.

1713.

PhotoFax, Inc. conducted additional surveillance of Ms. Croll from January 25, 2009

through January 27, 2009.  R. 1692.  The surveillance company reported on February 5, 2009

that, "[w]e have completed this portion of our investigation and found the claimant to be home

and inactive.  The claimant lives in a gated community with one exit and did not leave the

community during the course of the surveillance."  R. 1692.

On February 25, 2009 a Connecticut General Nurse Case Manager reviewed medical

information regarding Ms. Croll, found that "[p]hysical functionality is unclear," and

recommended an Independent Medical Examination ("IME").  R. 159.  On March 20, 2009

Connecticut General referred the file to Frank Polanco, M.D., a specialist in Occupational

Medicine, for an IME.  The IME was conducted on April 15, 2009.

According Dr. Polanco's report, his examination lasted 40 minutes.  R. 1671.  The report

indicates that he reviewed medical records that had been provided to him and a surveillance

video of November 16, 17 and 18, 2009, in which Ms. Croll was observed walking and moving

without difficulty or abnormalities.  R. 1669-71.  Dr. Polanco states that Ms. Croll

> clearly has a diagnosis of Addison's disease, which is a disorder that results when
> your body produces insufficient amounts of hormones produced by the adrenal
> glands.  This insufficiency is hypocortisolism and, in addition, she has
> hypothyroidism, as well.  The general symptoms of Addison's disease involves
> muscle weakness and fatigue, weight loss, darkening of the skin, nausea, muscle
> and joint pain, irritability, and depression, of which she has most of these
> symptoms.

R. 1670.

The report cited a previous functional capacity evaluation found in the medical

records that indicated that Ms. Croll was occasionally capable of lifting 11 to 20 pounds;

could occasionally climb, balance, stoop, crouch; had unrestricted use of her upper

extremities; but could not kneel or crawl.  Dr. Polanco concluded that Ms. Croll

> has the capacity to perform at a sedentary level.  She is certainly capable of
> standing, walking, sitting, and assuming these postures in an unrestricted fashion.
> She was also able to utilize her upper and lower extremities in an unrestricted
> fashion, as well.  Considering the complaints of muscle pain and generalized pain,
> and also because of her Addison's disease, it would be advisable to restrict her to
> a lower level of physical activity within sedentary range of physical work
> capacity.

R. 1671.

On May 9, 2009 Connecticut General referred the file for preparation of a Transferable

Skills Analysis" for the purpose of assessing Ms. Croll's continuing eligibility for benefits under

both the LTD Plan and the Life Plan.  R. 1657-58.  The referral requested that the analysis be

based on the IME.  *Ibid.*  The referral set a "wage requirement" of $4,198.14 per month (80% of

Ms. Croll's pre-disability income) for the LTD benefit but $0 for the LWOP benefit.  *Id.* at 1657.

In other words, unless Ms. Croll were found to be capable of earning $4,198.14 or more per

month, she would be considered disabled for purposes of the LTD benefit.  However, no dollar

minimum was set for purposes of determining whether she was disabled and entitled to continue

to receive the LWOP benefit.

Donna Humphries, MS, CRC, LPC, an employee of Connecticut General, completed a

Transferable Skills Analysis for purposes of the LWOP benefit on May 26, 2009.  Her report

states that she reviewed the "JD, DQ's date 7/24/08, and 6/30/99, DOT, OASYS, PAA/IME

dated 4-15-09 completed by Dr. Frank Palanco (sic)."  Those acronyms were somewhat

interpreted by counsel in the response to the pending motion.  [#32 at 12, ¶14].  As instructed,

she applied a $0 wage requirement.  She noted that Ms. Croll is a 52 year old with a Civil

Engineering degree who drives recreationally, uses the computer to check email, but suffers from

Addison's disease and hypothyroidism.  She found that Ms. Croll could "occasionally" lift and

carry 10 pounds; push and pull 25 pounds; climb ladders and stairs; balance, stoop, kneel,

crouch, crawl, use her lower extremities for foot controls, be exposed to moist conditions and

fumes, and work around machinery.  She further found that Ms. Croll could "frequently" grasp

firmly and reach in all directions; "continuously" accomplish fine manipulation and simple

grasping as well as sitting, standing, walking, seeing , hearing, smelling and tasting; but was

"unable" to endure extremes in heat and cold or to work overtime or extended shifts.  Ms.

Humphries then identified three occupations that she believed Ms. Croll could perform in the

Castle Rock, Colorado labor market: receptionist; telephone solicitor; and information clerk.  R.

1653.  Her report concluded,

> [t]he claimant has been given reasonable functionality to perform the occupations
> identified.  She last worked in 1994, but was employed in a Senior Engineering
> position and has obtained a Bachelor's level education; therefore, skills and
> experience are transferable to today's employment environment.  The occs
> identified are at a semi-skilled level and allow for the gap in employment and
> below the skill level she had previously obtained.

R. 1654.

Ms. Humphries did not perform a Transitional Skills Analysis for purposes of Ms. Croll's

LTD benefits, having concluded that there were no occupations that were appropriate for Ms.

Croll based on the wage requirement.  R. 156.

Ms. Croll began treatment with a new endocrinologist, Lori A Gerard, M.D., on June 4,

2009.  At that time, Ms. Croll complained of fatigue, recent weight gain, nausea and vomiting.

Dr. Gerard asked Ms. Croll to "try to slow down a bit."  R. 494.

Ms. Croll has indicated that she must sleep between 14 and 16 hours per day.  R. 238.

She also suffers with an occasional "Addison Crisis," which is an acute medical emergency

wherein she suffers low blood pressure, collapse, biochemical abnormalities, and hypoglycemia;

untreated, it could lead to coma or death.  These crises leave Ms. Croll completely bedridden for

two to four days.  She reported six Addison Crises within an eight week period in the Spring of

2009, and three more between October 1, 2009 and November 13, 2009.  These are often

precipitated by stress or lack of rest.  *Ibid.*

On June 9, 2009 Connecticut General informed Ms. Croll in writing and by telephone of

its decision that it would continue the payment of LTD benefits but that she no longer qualified

for the LWOP benefit.  R. 69-71; 146.  She was informed of her right to convert the group life

insurance coverage to an individual policy.  R. 70.

Shortly thereafter, on June 19, 2009, Dr. Boyle reaffirmed his opinion regarding Ms. Croll's condition.  He stated, "I do believe the patient is permanently disabled from any occupation on the basis of her Addison's disease."  R. 401.  Ms. Croll's treatment has included substantial medication usage.  As of June 19, 2009, these medications included Florinef, Cortef, Synthroid, Cytomel, Wellbutrin, Zoloft, HCTC, Flexoril, and Ambien.  R. 402.

Ms. Croll was admitted to the Swedish Hospital on June 20, 2009 with complaints of chest pain, left arm numbness, weakness, dizziness, nausea and palpitations.  She reported increasing weakness and fatigue over the past several months with worsening symptoms, including left hand and arm weakness in the past two to three days that traveled up her arm to her throat; and she felt diminished sensation around her mouth and on the left side of her face.  Her symptoms of nausea, heartburn, lightheadedness, and shortness of breath had also increased over the past several days.  Ms. Croll reported eight Addison's related crises in the past 3 to 4 months.

Kerr L. Blum, M.D. examined Ms. Croll and determined she was suffering from Addison's disease; left-sided weakness and exertional shortness of breath; hypothyroidism; hyponatremia, likely secondary to adrenal dysfunction and potentially contributed to by Zoloft; insomnia; depression; osteopenia; blurry vision, likely secondary to cataracts; elevated parathyroid hormone; constipation; heartburn; lightheadedness; and nausea.  R. 0516-0520.

On June 25, 2009, Ms. Croll reported to Dr. Gerard that she experienced shortness of breath, nausea, general weakness, left arm tingling and horrible GERD the past Friday.  During the appointment, Ms. Croll complained of fatigue, recent weight gain, nausea, vomiting, muscle weakness, unusual darkening of the skin, easy bruising and lightheadedness.  Dr. Gerard expressed the following opinion in a "To Whom it May Concern" letter of June 25, 2009:

> Cherisse has been unable to work a steady job due to the adrenal insufficiency
> that can become exacerbated with sudden stressors whether this be physical or

emotional stressors.  She frequently requires times of rest throughout the day and has been unable to perform an 8 hour a day job, five days a week.  Primarily, she has extreme fatigue, abdominal pain, nausea, vomiting, difficulty concentrating, memory changes, and more life threatening she can have severe hypotension and hypoglycemia in states of Adrenal Crisis.

R. 378.

On July 22, 2009, Dr. Boyle noted, "[b]ecause of fatigue, nausea, etc., her endocrinology specialist and I consider the patient totally disabled from any occupation."  R. 400.  On September 23, 2009, Ms. Croll complained of fatigue, recent weight gain, nausea, and muscle weakness.  Dr. Gerard's findings included Addison's disease, hypothyroidism, and hyperkalemia.

On September 25, 2009 Ms. Croll's attorney demanded the reversal of the LWOP decision and requested production of various documents.  R. 548-53.  Connecticut General responded on October 9, 2009.  R. 539-40.  Its letter noted that the "Waiver of Premium policy and Long Term Disability are two different policies," and that "the decisions concerning Waiver of Premium are separate from Long Term Disability based on the policy."  R. 539.  The letter advised Ms. Croll of her right to appeal.  *Ibid.*

Dr. Boyle authored another letter on November 23, 2009.  He stated,

[s]he has been seen by multiple endocrinology specialists with regard to her Addison's disease. It has been their opinion, as well as mine, that this patient is unable to work in any capacity because of this condition. . . . As stated previously, I am in disagreement with her functional capacity evaluation.  Patients with Addison's disease may appear normal during one evaluation, but experience relapses at other times.  Because of the exacerbating and remitting nature of Addison's disease, she is unable to work in a predictable fashion because of this condition.  She requires assistance with housekeeping, caring for her disabled son, and many other activities of daily living.

R. 378.

Appeal

On December 3, 2009, Ms. Croll filed an internal appeal within Connecticut General.  R.

224-33.  She provided information explaining that she had been deemed disabled by the Social

Security Administration, by Connecticut General with regard to her LTD policy, and by

IntraCorp with regard to her health insurance coverage.  Ms. Croll submitted additional medical

records, including letters from her treating physicians, such as Dr. Boyle's November 23, 2009

letter, and other evidence in support of her claim of disability.

By letter dated December 17, 2009, Connecticut General informed Ms. Croll that it had

received her appeal, and that "[u]nder normal circumstances, you will be notified of the decision

or status within 30 days from the date that the appeal is received."  R. 63.  The letter requested

that Ms. Croll sign a Disclosure Authorization to enable Connecticut General to retrieve updated

information regarding her condition.

Connecticut General notified Ms. Croll on January 4, 2010 that it would review the

medical information in the file and that "[w]e hope to receive the completed medical review

within four to six weeks.  If additional information is needed or the decision cannot be reached in

that time frame due to special circumstances, then we will notify you of the reason for the delay

and the time frame for the decision."  R. 61.  By letter dated January 6, 2010, Ms. Croll's

attorney submitted a signed Disclosure Authorization to Connecticut General and requested the

status of its review.  R. 1641-43.

On February 10, 2010 Connecticut General referred the file to Medical Evaluation

Specialists ("MES") of Norwood, Massachusetts in order to obtain an independent physician's

review of the filed.  MES Solutions assigned the project to Eric S. Bachman, M.D., a board

certified specialist in Endocrinology, Diabetes, and Metabolism, who is licensed to practice in

Massachusetts. R. 1633.  Dr. Bachman issued a report dated February 25, 2010.  R. 1625-33.  In

addition to listing the medical records that he reviewed, he summarized telephone conversations

he had with Dr. Boyle and Dr. Gerard on February 18 and 19, 2010 respectively as follows:

> Dr. Boyle states that he believes that this claimant is "disabled" from fatigue that
> is a consequence of adrenal insufficiency (Addison's).  While he states that "this
> can happen with Addison's patients" he also states "I have only had one patient
> with Addison's in 15 years."  When asked about the excessive thyroid hormone
> replacement that the claimant has been receiving for more than 10 years, he states
> "her pituitary is funny, and I am not her endocrinologist."

> [Dr. Gerard] states that "this patient is clearly hyperthyroid and we have tried to
> lower her dose.  The patient insists on more thyroid hormone prescription,
> including Cytomel."  Dr. Gerard had not seen the extremely high levels of thyroid
> hormones that were recorded in the last 10-15 years, including consistently
> suppressed TSH levels, nor that the claimant has been complaining of
> palpitations, tachycardia and had a cardiac workup this Summer.  She states that
> the claimant's fatigue could be due to over-replacement of thyroid hormone, and
> the claimant's fatigue is out of proportion to her clinical presentation and typical
> Addison's presentation.

R. 1629.

Dr. Bachman also quoted Dr. Gerard as stating that "she believes the claimant is self-

administering thyroid hormone and has a strong belief that 'more is better' resulting in

hyperthyroidism.  She states further that most of her patients with adrenal insufficiency do no

(sic) report this level of fatigue."  R. 1631.  Dr. Bachman was unsuccessful in his attempts to

speak with Dr. Sherman.  He did not pursue contacting Dr. Sherman because Dr. Gerard was Ms.

Croll's "current endocrinologist."  R. 1631.

Dr. Bachman concluded that the "restrictions noted by [Ms. Croll's] providers are not

supported by the documentation provided from 06/09/2009 forward," and that Ms. Croll "is

adequately treated for adrenal insufficiency based on the medications given."  R. 1631.  He

disagreed with the opinions of Dr. Boyle and Dr. Gerard regarding Ms. Croll's disability

"secondary to Addison's disease," because he viewed the adrenal insufficiency as "adequately

treated."  R. 1632.  He summarized his opinion as

this claimant is adequately treated with adrenal steroids for adrenal insufficiency, and this does not explain her fatigue nor should this result in an inability to work. This claimant does, however, have chronic hyperthyroidism that is caused solely by overreplacement with both long (Levoxyl) and short (Cytomel) acting thyroid hormone preparations.  This iatrogenic condition presents a reversible and potentially dangerous condition to the claimant and could result in fatigue. Significant reductions in the dose of thyroid hormone are warranted, and Dr. Boyle and I discussed this.

R. 1632.

By letter dated February 23, 2010 Ms. Croll's attorney, noting that no decision on the appeal had been reached within the 30-day time frame initially described or the four to six week period indicated for a medical review, informed Connecticut General that he would be filing suit on Ms. Croll's behalf.  Exhibit 1 to Motion [#26-1].  On February 25, 2010 Connecticut General received Dr. Bachman's report.  On March 30, 2010, Ms. Croll filed her Complaint commencing this lawsuit.  On July 7, 2010 Connecticut General informed Ms. Croll's attorney of its denial of her appeal.  Ex. A to Response Brief [#32-1].

**Standard of Review**

The parties agree that the Life Plan does not convey discretionary authority to Connecticut General, and that this Court's review of Connecticut General's denial of the LWOP benefit is de novo.  Under that standard the Court determines whether Connecticut General "made a correct decision based on the record before it at the time the decision was made." *Gilbertson v. AlliedSignal, Inc.,* 172 F. App'x 857, 860 (10th Cir. 2006)(unpublished)(citation and internal quotation marks omitted).

**Conclusions**

**A.  <u>Evidence of Inability to Work</u>.**

Connecticut General itself determined in the mid-90's that Ms. Croll was "totally disabled" under the definitions of both the LTD Plan and the Life Plan.  It provided the LWOP benefit for 13 years and is still providing the LTD benefit.  This does not mean that Connecticut General had no right to reevaluate Ms. Croll's continuing entitlement to benefits based upon new information.  *See Williams v. Metropolitan Life Ins. Co.,* No. 10-1504, 2012 WL 375503 at *11 (10th Cir. Feb. 7, 2012).

I do note, however, that the Court has found no evidence in the record suggesting that Ms. Croll's condition has improved since the original disability determination was made.  On the contrary, Ms. Croll's treating physicians have continued to express their opinions that she is incapable of performing any work because of her disability.  I acknowledge that treating physicians might tend to support their patients' disability claims.  *See Williams,* 2012 WL 375503 at *7.  I also acknowledge Dr. Boyle's admission to Dr. Bachman that he has treated only one Addison's patient in 15 years.  Nevertheless, the consistency of the three physicians' opinions, two of whom treated her for many years after the initial diagnosis of Addison's disease in 1992, is a strong point in her favor.

In addition, the Social Security Administration, through the ALJ, found that Ms. Croll was unable to engage in any gainful employment.  SSA disability determinations are not dispositive.  *See, e.g., Meraou v. Williams Co. Long Term Disability Plan,* 221 F. App'x 696, 706 (10th Cir. 2007)(unreported).  However, they should not be ignored.  *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 118 (2008).  "The weight that a SSA determination will be given inevitably is a case by case determination, affected by such things as the quality of the rest of the administrative record, the definition of disability used by the SSA, the quality of evidence presented to the SSA, the reasonableness of the SSA determination, and other factors that might

be deemed relevant in a particular case." *Torrey v. Qwest Communications International, Inc.,* No. 09CV645, 2012WL826891 at *8 (D. Colo. March 12, 2012).

In this case, the ALJ's decision was based on information that was some 14 years or more old by time Connecticut General undertook its review of Ms. Croll's disability claim.  He obviously did not have the benefit of the two medical opinions obtained by Connecticut General in 2009 and 2010.  The ALJ cited the opinions of Drs. Sherman and Boyle, and to that extent, it could be viewed as cumulative to medical evidence considered by Connecticut General.  Those factors tend to decrease the significance of the Social Security disability determination.  On the other hand, the ALJ applied the Social Security Act's definition of disability, which, as discussed below, is in substance the same as that involved here.  I also note in particular that the ALJ found that, despite her disability, Ms. Croll attempted unsuccessfully to work in three different sedentary jobs after she left Martin Marietta.  As discussed below, this takes on increased significance in the context of Connecticut General's vocational evaluation.  The ALJ implicitly found Ms. Croll's testimony about those jobs to be credible.  He explicitly found Ms. Croll's description of her limitations to be "consistent with the record when considered in its entirety." R. 1564.

In short, the ALJ decision is consistent with the medical information presented by the plaintiff in this case for the periods before and after that decision was made.  It is only one factor to be considered, but it does merit consideration.  So far as the Court had been able to determine from the record, it was given little if any consideration in the decision to terminate Ms. Croll's LWOP benefit.

**B.  <u>Evidence of Ability to Work</u>.**

1.  <u>Surveillance</u>.

Connecticut General placed Ms. Croll under surveillance, presumably to determine whether her daily activities belied her claim of disability. Over the course of seven days of surveillance in November 2008 and January 2009 she was reported to have been inactive on six of them. On one day she was seen walking, driving to a grocery store, loading groceries into her car, conversing, going to McDonald's, and going to the library. That is not inconsistent with her being disabled from employment, nor does Connecticut General so argue.

2. <u>IME</u>.

Connecticut appropriately asked Ms. Croll to submit to an IME. The IME report is entitled to some weight, both with Connecticut General and with this Court. An IME examination is typically short – in this instance about 40 minutes. There is nothing unreasonable about that, and I note as well that Dr. Polanco's report is based upon his reviews of medical records as well has his physical examination. The fact remains, however, that Ms. Croll's treating physicians formed their opinions from a much deeper base of knowledge of Ms. Croll and the effects of her specific history. There is also no indication in the report of the experience of Dr. Polanco, a specialist in occupational medicine, in treating Addison's patients. The IME report does not explain or elaborate on what the doctor meant by his recommendation that Ms. Croll be restricted to "a lower level of physical activity within the sedentary range of physical work capacity." R. 1671.

Overall, the Court finds that the IME report is a factor, but only one factor, that should reasonably be considered either by Connecticut General or the Court in assessing Ms. Croll's disability and capacity to work.

<u>Transitional Skills Analysis</u>

This analysis was conducted in-house.  That in itself is not an indictment.  However, I find that the analysis was flawed in certain important respects.

First, it is impossible to determine whether or to what extent Ms. Humphries considered the opinions of Drs. Sherman, Boyle and Gerard.  So far as the Court can determine from her report, her primary if not exclusive source of medical opinion was the IME.

Second, the analysis was based on the premise that one is disabled for LTD purposes if she cannot earn 80% of her pre-disability income, whereas for LWOP purposes, one is apparently considered not disabled if she can earn anything at all.  However, there is no wage requirement in either plan.  As discussed below, the Court interprets the definitions of "total disability" in the two plans to be substantially similar and to have significantly different meanings that those that Ms. Humphries was instructed to use.

Third, Ms. Humphries' conclusion that Ms. Croll is able to be employed as a receptionist is contrary to her actual history.  As indicated in the ALJ report, Ms. Croll took a job as a receptionist in a dental office in August 1994.  However, the ALJ found that "[s]he worked at this job for less than a week before she had to quit because of her medical condition."  R. 1564.  The record does not indicate that Ms. Humphries considered, or even was aware of, the Social Security disability determination.  The difference between her actual experience, albeit 15 years earlier, and Ms. Humphries' theoretical conclusion casts some doubt on the validity of the analysis.

<u>Disability Definitions</u>

Connecticut General places great weight in its brief, as well as in the Transitional Skills Analysis, on the difference in the definitions of total disability under the two benefit plans.  An individual is disabled under the LTD Plan if the disability "completely prevents [her] from

engaging in any occupation for which [she is] qualified by training, education, or experience."

R. 887.  One is disabled under the Life Plan if her disability prevents her from "engaging in any

occupation or employment for wage or profit."  R. 10.  It is indisputable that the two definitions

are different.  The question is whether the difference is significant.

To begin, it follows from Connecticut General's determination that Ms. Croll is now

totally disabled for LTD purposes and has been continuously since LTD benefits were first

approved that her disability renders her incapable of engaging in any occupation for which she is

qualified by her training, education or experience.  On its face it is difficult to distinguish

inability to engage in an occupation for which one is qualified from inability to perform any

occupation.

Connecticut General's answer is that while Ms. Croll cannot engage in any occupation

commensurate with her background, she can surely engage in certain types of unskilled jobs that

require little training or ability to master.  As indicated above, she tried one of the three jobs that

she is theoretically able to perform – receptionist – unsuccessfully.  I am willing to assume for

the sake of argument that Ms. Croll perhaps could work as a "telephone solicitor" on some basis.

I have no idea what an "information clerk" does, but perhaps on some basis she could do that as

well.  The question, however, is whether a reasonable interpretation of the definition of "total

disability" is that so long as an individual can perform any work of any kind, no matter how

menial, no matter what the individual's background is, and no matter for how many hours, then

she is not disabled for LWOP purposes.  I conclude that this is not a reasonable interpretation of

the term.

The Eleventh Circuit tackled that issue in *Helms v. Monsanto Co.,* 728 F.2d 1416 (11th

Cir. 1984).  A laboratory technician became incapable of continuing his work at Monsanto

because of vision problems.  A physician/arbitrator found that the individual could not engage in any occupation that required "any degree of visual performance," and that the he was "certainly disabled."  However, the plan defined disability to mean "totally disabled by reason of bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit," essentially the same definition as that of the Life Plan in the present case.  The physician found the insured to be "'not disabled within that definition'" because he "'couldn't think of any disability compatible with conscious life that would allow me to say anybody was disabled with the definition.'"  *Id.* at 1419.

> The Eleventh Circuit held that that definition of disability
>
> should not be given an absolute and literal interpretation.  It should not mean that the affected individual must be utterly helpless to be considered disabled.  It must be a relative term which means that the individual is unable to engage in a remunerative occupation or to do work in some profitable employment or enterprise.  Permanent disability is a question of fact that depends upon all the circumstances of a particular case.

*Id.* at 1420.

The court noted the Social Security Administration's standard for a disability determination was so stringent that the Fifth Circuit in one case had commented that it "'bordered on being unrealistic.'"  Still, the Social Security Act's requirements for disability were framed in terms of gainful, not just nominal, employment.  *Helms,* 728 F.2d at 1421.  The court held that "Mr. Helms is required to show physical inability to follow any occupation from which he could earn a reasonably substantial income rising to the dignity of an income or livelihood, even though the income is not as much as he earned before the disability."  *Id.* at 1421-22.

In *Torix v. Ball Corp*, 862 F.2d 1428 (10th Cir. 1988), the plan's definition of disability, in pertinent part, was substantially identical to that analyzed in *Helms* as well as that of the Life

Plan in the present case: the insured must be "totally and presumably permanently prevented from engaging in any occupation or employment for wages or profit as a result of bodily injury or sickness."  The court found the *Helms* analysis to be "persuasive."  *Id.* at 1430.  It held,

> We believe that the policy concerns which underlie ERISA would be severely undermined if we endorsed a literal reading of the plan's terms.  Thus we join the reasoning of the Eleventh Circuit and hold that a reasonable interpretation of a claimant's entitlement to payments based on a claim of "total disability" must consider the claimant's ability to pursue gainful employment in light of all the circumstances.  The standard to be applied will require the claimant to establish a physical inability to follow any occupation from which he can earn a reasonably substantial income rising to the dignity of an income or livelihood, although the income may not be as much as was earned prior to the disability.  If plaintiff meets his burden, recovery may not be denied on the basis of overly restrictive interpretations of the plan's language.

*Id.* at 1431.

I agree with these cases and, in any event, I am bound by Tenth Circuit precedent.  Courts must be cautious in adopting an interpretation of language in a plan that differs from an absolute and literal interpretation, just as plan administrators must be cautious about engrafting terms on a plan that are nowhere provided by the plan's language.  At the same time, when a court is given the responsibility to interpret the requirements of an employee benefit plan, it must be done with a dose of common sense and with the purpose of ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90 (1983), in mind.  I have considered the thoughtful decision of Judge Stewart in *Benson v. Hartford Life and Accident Insurance Co.,* No. 2:10-CV-275, 2011 WL 5239745 at *5-6 (D. Utah Nov. 1, 2011), which was submitted on behalf of Connecticut General as supplemental authority, but I find nothing in that order that is inconsistent with the views expressed here.

The zero wage requirement provided to Ms. Humphries for purposes of her Transitional Skills Analysis is inconsistent with the reasonable and appropriate interpretation of the plan.  In

theory, as the *Helms* court noted, a literal interpretation of the plan would preclude a finding of disability even if she were only capable of selling pencils on the street corner. Ms. Humphries did not, of course, apply the definition to that extreme. But, there is nothing in her report that indicates whether Ms. Croll is capable of performing "gainful" employment even in the three types of employment she identified. Accordingly, this Court places little weight on the Transitional Skills Analysis.

Dr. Bachman

The Court applauds Connecticut General for seeking and obtaining an independent review of the file by a certified endocrinologist in the course of processing Ms. Croll's appeal. I do not find evidence that Dr. Bachman was provided or knew about the Social Security Administration's disability determination. With that exception, however, I have no reason to suspect that he was not provided the relevant records. He talked with Dr. Boyle and Dr. Gerard and made at least some effort to contact Dr. Sherman. He considered prior functionality evaluations. Although he does not directly address or express opinions about what type of work Ms. Croll is able to perform, it is clear that he disagrees with Dr. Boyle's and Dr. Gerard's conclusions that Ms. Croll is "disabled" secondary to Addison's disease. He believes her adrenal insufficiency has been adequately treated, and that her "hyperthyroism" and resulting restrictions and limitations are the result of "over-replacement" of thyroid hormones. R. 1632. I note that Ms. Croll's current endocrinologist, Dr. Gerard, also expressed concern about the possible effect of over-replacement of thyroid hormones.[1]

---

[1] It appears to this Court from the comments of the several doctors that Ms. Croll should consult with Dr. Gerard or whomever she is treating with today about the over-medication issue and, under her doctor's guidance (and in compliance with it) make such changes in her self-medicating habits as might be appropriate. Failure to do so could imperil her health and could possibly result in a different outcome in court if her disability status were challenged again.

Dr. Bachman's opinions are entitled to be considered and respected by this Court. By the same token, the record reflects that doctors equally well qualified, and who have direct experience in treating the patient, disagree with Dr. Bachman's opinions. That does not necessarily make his opinions less valid that those of the treating physicians, *see Williams,* 2012 WL 375503 at **6-7, but it is one factor to be considered. Dr. Bachman's opinions seem to support a view that Ms. Croll is capable of doing some type of work. However, as indicated above, his report does not clarify what his definition of "disability" was, nor did it direct address what type of work, if any, he believes she is capable of performing. These facts tend to decrease the weight that this Court is willing to give to his conclusions.

If this were a situation where the plan administrator had discretionary authority and the Court were applying an abuse of discretion standard of review, Connecticut General's reliance on Dr. Bachman's opinion in denying Ms. Croll's appeal would be entitled to greater deference. However, here the Court considers the totality of the evidence and does so de novo.

**Order**

The Court finds that the evidence considered as a whole does not support the conclusion that Ms. Croll is capable of successfully performing gainful employment within the meaning of a reasonable and appropriate interpretation of the disability clause in the Life Plan. The Court cannot find or conclude that the administrator made a correct decision based on the record before it at the time the decision was made. Accordingly, Motion #26 is GRANTED. Connecticut General's decision to deny the LWOP benefit is reversed. The Court enters its final judgment in favor of the plaintiff, Cherisse Croll. The Court directs the defendant to reinstate the life insurance policy without the payment of premiums for so long as Ms. Croll's total disability, as

defined in this order, continues, up to her 65th birthday.  Pursuant to 29 U.S.C. § 1132(g), the

Court awards to the plaintiff her reasonable attorney's fees and costs.

DATED this 26th day of April, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge